Oct. 1831.

Miller
v.
Miller.

---

The SOCIETY FOR ESTABLISHING USEFUL MANUFACTURES,
v. WARREN HAIGHT.

Parol evidence is inadmissible to disannul or substantially vary a written agreement, except on the ground of mistake or fraud.

Where there is a clear subsequent and independent agreement, evidence of it may be received; but not where it is a matter passing at the same time with the written agreement.

There are instances where a general understanding and practice may be set up to *explain* a written agreement, but it must amount to a custom, and be pleaded as a custom from time immemorial; such as the custom in favour of the tenant's taking the way-going crop; but even such custom cannot be insisted on if it be excluded by the terms of the agreement.

Under a lease from the Society for establishing useful Manufactures, of a lot of land extending from their canal on Boudinot street back to the river Passaic, with the privilege of a certain quantity of water to be used on the lot for milling purposes, without any limitation as to the head and fall; the

50

tenant may avail himself of all the head and fall that can be had within the specified limits of his lot.

Parol evidence of a general understanding among the tenants, or of previous circumstances going to show that the lots on this tier were entitled to less head and fall, is inadmissible ; and an injunction to restrain the tenant from sinking his wheel-pit and race to a level with the surface of the water in the Passaic, so as to obtain all the head and fall between the canal and the river, was refused.

THE facts stated in the complainants' bill are briefly these. In 1792, after the incorporation of the Society for establishing useful Manufactures, they purchased of one Cornelius Van Winkle a tract of land, on which were a saw-mill, grist-mill and dam, situate on the main stream of the Passaic river at Paterson, together with the bed of the river and an island in the river adjacent to the mill. The whole tract lies below the falls, and below the aqueduct made by the Society to supply the mills and factories in the town with water. The mill was an ancient mill, and had been in operation at that time upwards of twenty-five years. In November, 1810, the mill and dam were swept away by a great freshet, and have not since been rebuilt, but they intend shortly to restore the dam.

Before the dam was swept away, the society brought the water by a canal from the Passaic above the falls, along what is now called Boudinot street, and there laid off certain building lots, or mill seats, which they offered to lease with certain privileges, and with a right to have a head and fall of water equal to twenty-two feet, which was all that could be granted or enjoyed while the Van Winkle dam was standing. They arranged the head and fall in such manner, as that there should be no interference between their use and right of the water-privileges at the Van Winkle mill and the mills along the canal.

According to this arrangement they proceeded to make leases of the said mill seats on Boudinot street. In 1807 they granted a lease to John Clark, and one to John Parke, who erected their mills and water-wheels with reference to the Van Winkle dam below, and with a full knowledge that only twenty-two feet head and fall of water, were appropriated to the line of mill-seats on Boudinot street. In 1808, they caused a map to be made of

the lots and premises, which has been in use ever since as the public map of the society; on which it is expressly stated that each of said lots could have a fall of water of twenty-two feet.

It is then further charged, that all the subsequent lessees have known and understood that only a head and fall of twenty-two feet was granted by the society; and such was the understanding of one Henry Godwin, who on the 1st February, 1816, took a lease for the mill-seat now occupied by Warren Haight, the defendant. That this mill-seat was first leased to one Henry Berry, in October, 1811. Berry assigned his right to Godwin, and Godwin gave up the assigned lease and took out a new lease to himself. That there has never been any controversy between the society and any of the lessees about the head and fall, until June, 1827, when the defendant undertook to sink a new wheel-pit at the outlet of the tail-race of his mill, to a level with the surface of the water in the Passaic river, in its natural current; and that if not restrained he will thereby obtain a head and fall of twenty-six feet and more, and thereby deprive the society entirely of their water rights and privileges, growing out of the purchase of the Van Winkle mill and dam. That as soon as they were informed of the aggression, they served a written notice upon the defendant, stating that he was encroaching upon their privileges; that he was restricted to twenty-two feet head and fall; and that they intended shortly to rebuild the Van Winkle dam; and protesting against his intended encroachments. That notwithstanding this notice, the defendant persists in his unlawful undertaking. The bill prays that he may be restrained from further proceedings, and also from continuing the improvements already made.

A demurrer to the bill was overruled, after argument, in July, 1828.

The defendant, in his answer, denies any knowledge of the purchase from Van Winkle; but says he has been informed, and therefore admits, that the mills and dam said to have been purchased as aforesaid, were swept away by a freshet in 1810, and that the complainants have not rebuilt them. He does not admit that they intend to rebuild them; and denies that he ever heard of such intention until after he had made the improvements com-

plained of. He does not admit that the lessees of mill-seats under the society, were restricted to twenty-two feet head and fall, or any other head and fall, except such as was limited by the situation of the canal and river; nor does he believe there was any such understanding; nor was there any number of feet guaranteed to the lessees by the society.

He states further, that he never heard of any map of the premises, until the society had filed their bill. He admits, that in 1816 the complainants leased to Henry Godwin a mill-seat on Boudinot street, which is now in possession of the defendant; he holding it by divers mesne assignments from Godwin, who is now deceased. That at the time of taking the lease there was no stipulation that he was to have a head and fall of *only twenty-two feet*; but it was expressly agreed that he should have the lot from the canal to the Passaic, with such head and fall as existed between the said canal and the river, as it was at the time. He denies that there was any understanding with any of those who took leases after the dam was carried away, that they should be limited to twenty-two feet head and fall, or that they had any notice that the society intended to rebuild the dam, or to raise the water above what was then its ordinary level; and asserts that he himself had no such notice, and believed that he was purchasing the right to use the water on the lot with all the fall between the canal and the river. He says that long before he made his improvement, other lessees had made similar improvements on their property without interruption or complaint. He admits the erection of the building and sinking the pit; and also the notice given by the complainants, after the pit was sunk and the building raised and nearly completed; and insists upon the enjoyment of his lot and privilege, according to the terms of the lease under which he holds.

Depositions were taken and proofs exhibited. The case was argued by

*T. Frelinghuysen* and *W. Pennington,* for the complainants.

*P. Dickerson,* for the defendant.

Cases cited :—*Eden Inj.* 140 ; 2 *John. C. R.* 162, 272, 463 ;
2 *Ver. R.* 39 ; *Prec. in Ch.* 530 ; 1 *Ves.* 543, 188 ; 3 *Atk. R.*
21 ; 2 *Atk. R.* 83 ; 2 *Dow,* 519 ; *Coop. Eq. R.* 77 ; 16 *Ves. jr.*
257 ; *Angel W. C.* 50, 51, 75, 149 ; 2 *Stark. Ev.* 386 ; 1
*Saund.* 346 ; 2 *East. R.* 358 ; 1 *Ves. jr.* 241 ; 1 *John. C. R.*
349 ; 1 *Bro. C. R.* 92 ; 2 *Ves.* 375.

Oct. 1831.

The Society,
&c.

v.

Haight.

THE CHANCELLOR. The complainants have offered in evi-
dence, the old lease from the society to Henry Berry, and which
was assigned by him to Henry Godwin. It bears date in 1811,
and is for twenty-one years, reserving a rent of seventy-five dol-
lars. It bounds on the river, and there is no limitation or cove-
nant as to the head and fall of water between the canal and the
river.

They have also offered in evidence a counterpart of the lease
from the society to Henry Godwin, in 1816. It is for seventeen
years, reserving a rent of ninety dollars. This lease also bounds
on the river, and is also without restriction or limitation as to
the head and fall of water.

If this case is to rest upon the lease between the parties, inde-
pendently of any evidence that may go to explain, modify, or
contradict that instrument ; and independently of any agreement
or understanding, which, although out of the lease, may be sup-
posed binding in equity, there can, I think, be no doubt as to
what ought to be done. The lease is absolute on the face of it.
It grants, for a limited time, the use of the whole property, for a
valuable consideration. There is neither doubt nor difficulty
about it, and the bill must be dismissed as entirely groundless.
But if evidence is to be admitted to show a state of things which
existed prior to the lease, or to show the understanding of the
parties as to certain rights directly affected by the lease, or the
understanding of third persons in relation to property similarly
situated, it may lead to a different result.

I propose, then, to examine distinctly the evidence offered by
the complainants in support of their bill, independently of the
leases, and see how far it is admissible evidence ; and if admitted
either in whole or in part, ascertain the effect of it on the rights
of the parties.

There are three prominent matters relied on by the complainants :—1. There was a map, which they call a public map, of the premises, embracing all the mill lots on Boudinot street, of which the defendant's is one. On the face of this paper, there is a written description of the property embraced in it, to which description is added these words : " Each lot marked on this map can have a fall of water of twenty-two feet." This map is proved to have been made for the society about the year 1808, by Abraham Willis, who was a surveyor. It was kept by Mr. Abraham Vanhouten, the society's agent; and one of the witnesses says he saw it whenever he pleased, and that this was supposed to regulate the whole. The same witness says that he thinks he has seen the map three or four times; he remembers seeing it twice in one week. He saw it at Mr. Vanhouten's house, and on the lot, and at the house of the surveyor while he was making it; since which he has not seen it until lately. Several saw it about the time the survey was made. Another witness testifies to the making of the map by Willis. He saw it directly after it was made, and has seen it frequently since, until within some years last past. He has not seen it lately, having had no occasion to see it. After the map was made he always referred to it as his guide.

It is contended that this map is evidence in relation to the contracts, or to the rights of the parties under the contracts; and that, according to the map, the lessees are entitled to twenty-two feet head and fall, and no more. Taking this to be the case, is it evidence to contradict the lease? If such is to be the effect of it, I am at a loss to perceive how it can be admitted. The general rule is against the admission. It is clear and explicit, and has been adopted upon great deliberation. The difficulty generally is, not as to the rule, but the exceptions to it; for like all other general rules it has its exceptions. In cases of *fraud, mistake, surprise,* or *accident,* clearly proved, parol evidence has been admitted. They raise an equity on a ground collateral to the deed, and " may be holden to vary it accordingly :" *Rich* v. *Jackson,* 4 *Bro. C. C.* 419, *in notis.* But here there is no such ground laid. The complainants do not invoke aid on either of these heads of equity ; nor do they seek it because of any *omis-*

Oct. 1831.

The Society,
&c.
v.
Haight.

*sion* in preparing the lease. But they attempt to bring in this map, and the facts that have been testified to in relation to it, as evidence of an agreement or understanding, as to the precise head and fall of water that the lessees were to enjoy, and that agreement or understanding made or had at the time the original agreement or lease was entered into; for if not then, when was it? In this attempt they are opposed by well settled principles. Where there is a clear, subsequent and independent agreement, varying the original one, evidence of it may be received; but not where it is of a matter passing at the same time with the written agreement. In *Movan* v. *Hayes*, 1 *John. C. R.* 343, the chancellor says, the rule is established in this court, as well as at law, that parol evidence is inadmissible to disannul, or substantially vary a written agreement, except on the ground of mistake or fraud; and the cases of *Irnham* v. *Child*, 1 *Bro. C. C.* 92, and *Hare* v. *Shearwood*, 1 *Ves. jr.* 241, are cited. It is important, too, to notice the fact, that this agreement or understanding, so far as it is to be inferred from the existence of the map, is expressly denied in the answer, in which the defendant swears that he never heard of any such map until after the filing of the bill. Such denial shows more clearly the propriety of excluding the evidence, and adds strength to the rule.

2. A second matter relied on, is the alleged general understanding of the lessees on that tier of mill-seats, that their right was limited to twenty-two feet head and fall.

On this subject one of the witnesses, Clark, who leased in 1806, before the carrying away of the Van Winkle dam, testifies, that he thinks it was generally understood, after witness took his lease, that the lots to be leased on that tier had a head and fall of twenty-two feet. He was frequently asked, about this time, what was the head and fall, and he always informed inquirers that it was twenty-two feet. When he made his agreement with Mr. Boudinot, he was to have twenty-two feet head and fall, and it was so expressed in the agreement, which he gave up to the society fourteen or fifteen years ago. This agreement was before the map, and that fact witness states as the reason why it was expressed in the agreement. Charles Kinsey, another witness, states, that he lived in Paterson when the mill lots were laid out,

and always understood from common report that they had twen-ty-two feet head and fall.   He has been inquired of by captain Ward and others on the subject, and always told them what was the common understanding.   John Parke says, he has always considered that the lots on Boudinot street had twenty-two feet head and fall, and always told others so.   He thought himself entitled to no more, and that if he had not so much he would be entitled to a remuneration.

Admitting now, for the sake of the argument, that this evidence proves a general understanding that the lessees on that tier of lots were entitled to no more than twenty-two feet of water, (which I think it does not,) can such general understanding alter the tenor of a solemn instrument?  Is it not altogether too vague and unsatisfactory?  There are some instances, it is true, where a general understanding and practice may be set up to *explain* a written agreement; but it must amount to a custom, and be pleaded as a custom from time immemorial.   Such was the case of *Wigglesworth* v. *Dallison, Doug.* 201 ; where the custom of the country in favour of taking *the way-going crop* by a tenant, was set up and maintained.   But even such custom can-not be insisted on if it be excluded by the terms of the agree-ment.

This evidence appears to me to come precisely within the rule applied to the evidence respecting the map.   It proves, if any thing, an agreement between the parties, or something in the nature of an agreement, made at the time of the lease ; and, affecting the rights of parties under the lease, it is clearly inad-missible.

3. A third matter relied on by the complainants is, that Henry Godwin, under whom the defendant holds by assignment, knew of this general understanding, and was bound by it ; and that, consequently, his assignee is also bound.

The only evidence on this subject is that of Clark, who says he heard Godwin say he had twenty-two feet head and fall ; and he asked deponent if he had taken the height, and deponent said he had, that it was twenty-two feet.   This was while Godwin occupied the lot, not when he made the agreement and took the lease ; and being after the lease was made, if it proved " a clear

and independent agreement, varying the lease," it might be admissible. But it proves no such thing. The deduction to be drawn from it, is, that Godwin had satisfied himself that he had twenty-two feet head and fall; not that he had no more, or was entitled to no more, or that there was an agreement of any kind whatever.

My conclusion is, that no part of this testimony can be received, to vary, or alter, or contradict, the plain tenor of a written agreement or lease.

It was contended, however, by one of the counsel of the complainants, that the evidence does not contradict the lease, or vary its terms, inasmuch as the lease is silent as to how much head and fall the party is entitled to. The lease grants to the lessee the one half of all that lot of land, beginning, &c., bounded on the south by the canal in Boudinot street, west by a lot occupied by Alvin Wilson, north by the Passaic river, and on the east by Crane's lot; together with the privilege of taking water from the canal in Boudinot street equal to seventy-two square inches, for the use of a fulling-mill, &c.: to have and to hold, &c. By virtue of this grant, the lessee takes the lot from the canal to the river without any restriction whatever. If the lessors were to set up an agreement or understanding that the lessee was not to use the lot within twenty feet of the river, would it not be contrary to the tenor of the lease? Would it not impose a restriction by parol, where none existed by the covenant? So with regard to the water. The lessee is to have seventy-two square inches of water from the canal. If there were no restrictions in the lease, he might use the water for any lawful purpose; but by the lease it is to be used for milling purposes only. This was a restriction the company had a right to impose, and the lessee was at liberty to agree to it if he thought proper; and having done so, he is bound by it. The use of the water is restricted in no other way by the terms of the lease. But if an agreement is set up, restricting the lessee to twenty-two feet head and fall of water, when by the lease he is entitled to twenty-six feet, are not the terms of the lease altered, and the party's rights impaired? Will he enjoy what by the terms of the lease he is at liberty to enjoy? The matter is too plain for controversy. Where there is a deed in

51

writing, says Ld. Eldon, it will admit of no contract that is not part of the deed. Whether it adds to or deducts from the contract, it is impossible to introduce it on parol evidence: *Irnham* v. *Child and al.*, 1 *Ves. jr.* 93.

Upon the whole, I entertain no doubt that evidence, such as the complainants seek to offer, would vary the terms of the agreement, and is therefore inadmissible.

I would observe, further, that if I should be mistaken in my conclusions on the questions of evidence, and if the whole of the testimony offered by the complainants was competent, it would not, in my opinion, vary the result. The bill charges that the knowledge and understanding of all the lessees was universal, that *only* a head and fall of twenty-two feet was granted. This should be fully and clearly proved. To vary the written agreement, the parol proof should be, if not so formal, at least as satisfactory to the mind of the court, as the evidence furnished by the deed. I do not think the allegation is satisfactorily sustained by the evidence. The map certainly does not prove it. In describing the property, it is said, " each lot *can have* a head and fall of twenty-two feet." Does this necessarily mean, it shall have that precise quantity, and no more? Does it mean any thing more, than that each lot, from its relative position to the canal at one end, and the river at the other, is capable of having on it a head and fall of twenty-two feet at least? Without deciding on the import of the description, it is sufficient to say, that if there be doubt, reasonable doubt, it is conclusive against the evidence; it can have no effect as against the lease.

And so with regard to the general understanding, as proved by the witnesses; when the testimony is examined, it turns out to be simply this: that it was *generally* understood that the lots leased on that tier had a head and fall of twenty-two feet. Mr. Kinsey mentions this common report in his evidence, and says it originated from the fact that the engineers, in taking the level, reported that there would be a head and fall of that amount between the canal and the river. This is mere description; and though the knowledge of it may be brought home to Godwin, it cannot amount to an agreement that will vary his rights under the lease. One of the old witnesses says, he considered himself

entitled to only twenty-two feet; but he does not say that this was a common understanding, and especially among those who took leases after the dam was swept away.

It would be a source of regret to the court, if the decision in this case should result in any serious injury to the complainants; but feeling cannot be suffered to have any operation in the administration of the law. The complainants will remember, that it grows out of their own act. They had an unquestionable right to the mill-seat below; but the mill and dam being carried away, they had the same right to abandon it if they thought proper so to do. That such an abandonment has actually been made, is not necessary for me to decide; but the fact, that a grant has been made by the society, of rights and privileges inconsistent with those here assumed by themselves, is sufficient evidence of such abandonment, in favour of the grantee, to protect him from the interference of this court, by injunction.

Let the bill be dismissed, with costs.