Between PETER MARTIN and WILLIAM MARTIN, appellants, and MICHAEL RIGHTER et al., respondents.

Parol evidence is admissible for the purpose of establishing an allegation of fraud in the inception of a release.

Where the fact was established that the parties to a general release, at the time of the execution of it, understood perfectly that the object, and the sole object, was to make the relessee competent as a witness, in a pending suit; it cannot be used to bar a recovery on a bond and mortgage.

That the relessee intended at the time to make use of the opportunity to obtain a general release, and turn the transaction from an innocent to a fraudulent purpose, makes him a fraud doer.

Where any one has done an act or made a statement which it would be fraud on his part to controvert or impair, and such act or statement has so influenced any one that it has been acted upon, the party making it will be estopped and cut off from the power of retraction.

The case sufficiently appears from the opinions delivered.

The cause was argued in the Court of Chancery, by E. W. Whelpley, for complainant, and L. A. Chandler, for defendant.

At the term of February, 1855, a final decree was made by his Honor Benjamin Williamson, Chancellor, whereby it was adjudged that complainants' bill be dismissed with costs. From this decree an appeal was taken.

The Chancellor furnished the court with the following opinion, as containing the reasons for his decree.

WILLIAMSON, C. On the 5th of July, 1842, Stephen W. Righter recovered against Michael Righter, the defendant in this suit, a judgment in the Circuit Court of the county of Morris, for the sum of eleven hundred and sixty dollars and forty-two cents, damages and costs of suit. Afterwards the defendant, becoming further indebted to the said Stephen W. Righter, for the purpose of securing such indebtedness, and as collateral and further security for the judgment debt, on the seventh of September, 1842, gave

the bond and mortgage, in controversy in the present suit, conditioned for the payment of $1333.65 on demand, with interest. As to the amount, or the honesty of the debt, there is no dispute.

On the 19th of May, 1847, Stephen W. Righter executed, in due form of law under his hand and seal, a release to the defendant. It expresses to be for the consideration of one dollar paid, and to remise, release, and for ever discharge the defendant, his heirs, executors, and administrators, of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variance, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law or in equity, which the said Stephen W. Righter ever had, then had, or which his heirs, executors, or administrators thereafter could, should, or might have, for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the day of the date of the release.

This release is set up as a bar to a recovery upon the bond and mortgage.

About eighteen months after the execution of the release, Stephen W. Righter assigned the bond and mortgage to Peter Martin and William Martin, the complainants. They caused an execution to be issued upon the judgment. The defendant then interposed this release, and obtained a rule of the Circuit Court of the county of Morris upon the complainants to show cause why the judgment should not be cancelled of record. The complainants then filed this bill, praying that the said release may be declared fraudulent and void as to them, or that it may be declared to have been executed by mistake, or that it may be reformed, so far as respects the bond and mortgage, so as not to apply to them, and that the mortgaged premises may be sold, &c. An injunction was

allowed.    The cause is now brought to a final hearing upon its merits.

There can be no controversy but that the release is comprehensive enough to include the judgment and bond and mortgage.    That release must be removed out of the way before the judgment or mortgage can be enforced. No parol testimony can be admitted for the purpose of showing that the intention of the parties, or either of them, was different from that expressed in and by the release itself.    If it can be shown that the instrument was procured by fraud, that will vitiate it, and it will be set aside *in toto*.    If it can be shown that there was a mistake in the drawing up and executing it, for instance, that the scrivener was instructed that in preparing the release he should exclude the judgment and mortgage, and that it was executed under the impression that it was drawn according to such instructions, but that by mistake the scrivener had omitted to make the exception, in such case this court will relieve the party whose rights are affected by such mistake.    But such mistake must be established by evidence so clear and incontrovertible that the court may feel an assurance that it cannot itself make any mistake in confiding its judgment upon it.    Courts of equity have gone quite far enough in reforming sealed instruments.    There are instances where it would seem that the supposed hardship of the case has had more weight than the evidence in influencing the judgment of the court.    Parties are not entitled to relief against their own mere carelessness and negligence.    A mistake in a sealed instrument can be proved only by reliance upon parol testimony.    It is always dangerous, where parties have reduced their intention and agreement to writing, to undertake to substitute what they intended to do for that which they actually did do.

The complainants endeavor to avoid the release upon three grounds: first, fraud; second, mistake; third, that the defendant's conduct induced them to advance their

money and to purchase the judgment and mortgage, and that he is chargeable, therefore, with standing by and seeing the complainants advance their money upon obligations of his own which were worthless.

First. Was there anything in the manner in which the ᵣelease was executed which subjects it to the charge of fraud, or to make it fraudulent for the defendant to apply it to the judgment and mortgage? Let us take the case as it is made by the bill. The bill alleges, that one Joseph C. Righter, and the defendant, were connected in business; that they held the drafts of Matthias Kitchel for about $1250, which had been drawn in their favor upon different mercantile houses at the South, and which had been protested for nonpayment; that Joseph C. Righter and the defendant dissolved their business connections, and in their arrangements the drafts became the individual property of Joseph C. Righter; that Joseph C. Righter, being desirous of bringing suits at law to collect the amounts due on the drafts against the drawer, and being in embarrassed circumstances, and fearful that the collection of the drafts might be embarrassed by his creditors if he should bring suit in his own name, applied to Stephen W. Righter to take the drafts, and institute a suit upon them in his name, but for the benefit of him, Joseph C. Righter; that Stephen W. Righter did accordingly commence the suit; that when the said suit was about to be tried, the defendant alleged that he was in- terested in the said drafts and in the event of the suit, and John S. Hager, esq., who was attorney in the suit, thereupon advised that it might be necessary to examine the defendant as a witness, and that it was necessary for that purpose to release him, in order to discharge any in- terest he might have; that the said attorney then filled up a printed form of general release, and requested Stephen W. Righter to sign it; that he objected, on the ground of the release being too broad and general in its terms; whereupon the defendant replied, that it was no

matter, as the release should be given up to him as soon as the trial was over, and that it was necessary to execute the release in order to discharge his interest in the suit (the defendant then well knowing that he had no interest, and that the release was unnecessary) ; that the attorney advised that it was right and safe to execute the release, and that no harm could come from it ; that the defendant was examined as a witness in the cause, and that the only intention of the parties was to release the defendant's interest in that suit ; that no consideration passed for the release, and that the defendant has frequently since admitted his indebtedness on the bond and mortgage.

What was there in this transaction to justify the court in declaring that the defendant procured the release by fraud ? The proposal did not come from him to give the release. It is said he committed a fraud in pretending he was interested in the drafts, when he was not, and when he knew he was not. If this were so, it was no fraud. Joseph W. Righter, who declared the drafts belonged to him, was standing by to contradict the assertion. But the evidence in the cause shows that there was a dispute as to the ownership of the drafts, and the weight of the testimony is, that the defendant was interested in the drafts to the amount of one half.

But it is said there is another fact : he promised the release should be given up as soon as the trial was over ; that there was no consideration given for the release, and the only object of it was to make the defendant a competent witness in the suit. But all this is at variance with the instrument itself ; and to permit the complainants to prove it, would be admitting parol testimony to contradict and vary the plain and unambiguous terms of a sealed instrument. If the object was not to release the defendant from anything except from such liabilities as made him incompetent to be a witness in the suit, why was not such a release drawn ? There is no pretence that the defendant dictated the terms of the release. It was drawn

by the attorney of the other party, and was retained for some time, and then delivered; there can be no pretence that it was done hastily or through inadvertence.

But there is another view of this feature of the case. This release was offered in evidence, and was received by the court as a valid release between the parties. Upon the faith of it, the defendant was admitted as a competent witness, and was permitted to give evidence in the suit at law. Stephen W. Righter, or the complainants, who stand in his place, now come into a court of equity, and allege that the release was to be delivered up after it had effected its purpose with the court; and the defendant not fulfilling his promise, this court is called upon to declare it fraudulent and void. Such a case cannot be favored in this court. The agreement, if there was such a one, was fraudulent. It was imposed upon the court as a valid release, when the parties had agreed it should be considered a mere matter of form, and be cancelled.

But there is another circumstance connected with this part of the case, as the complainants state it in their bill, very unfavorable to a party seeking redress in a court of equity. It is stated, as a favorable circumstance to the complainants' case, that it is admitted by all parties that Stephen W. Righter had no interest in the suit at law. It is then asked, why, then, would he release this defendant of a debt of fifteen hundred dollars well secured without deriving any advantage to himself? The answer is, he did release it, and there is his release under his hand and seal. But the misfortune of Stephen W. Righter is, that while assuming a position to avail himself of this argument, he is obliged to admit that he was conducting the suit for the benefit of Joseph C. Righter, and doing it in his own name, for the purpose of enabling Joseph C. Righter to protect his property from his creditors. The fraudulent position which he occupied forced upon him the necessity of executing the release. Where a party in committing a

fraud, has a still greater one practised upon himself, he can have no redress against it in a court of equity

The proof does not sustain the allegation of fraud on the part of the defendant in procuring this release. It was given to him without his solicitation. I can see no fraud in his setting it up as a defence against a recovery upon this bond and mortgage. They are embraced in the legal construction of the instrument, and it is not competent under the circumstances, to show that it was the intention of the parties that it should be limited in its legal application.

Second. The bill prays that the release may be declared to have been executed by *mistake*. The power of the court to correct a mistake in the execution of a written instrument, was well considered in the cases of *Smith* v. *Allen and others* (*Saxton* 46), and of *Hendrickson et al.* v. *Ivins* (*Saxton* 568). The mistake alleged is this: that when the attorney of Stephen W. Righter had prepared the release, he objected to sign it, on the ground that it was too broad and general in its terms, as covering everything; whereupon the defendant replied, it was no matter, as the release would be given up; and then Mr. Hager, the attorney, advised Stephen W. Righter to sign it.

It is manifest that the mistake was not in Stephen W. Righter's signing the release under a misapprehension as to its comprehensiveness; for when he made this objection, neither the defendant or the attorney questioned the correctness of his judgment as to the character of the instrument. He did not execute the release under a misconception or mistake as to its contents or as to its comprehensiveness or effect. He executed it relying upon the promise of the defendant that he would return it to him. In that respect, the result has proved he was mistaken; but that kind of mistake this court cannot remedy. It is an obligation of honor, which the parties must settle between themselves.

Third. The complainants insist that the defendant

should not be permitted to set up the release as against them, because they were induced by the acts and conduct of the defendant to advance their money upon the bond and mortgage.

The complainants are the assignees of the bond and mortgage. They are *bona fide* assignees. Do they stand in any better situation, in respect to the defence set up, than the obligee himself did at the time of the assignment? The assignee of a bond takes it subject to all the legal objections and equities which exist against it in the hands of his assignor. If at the time of the assignment this release was a legal defence as against the obligee, it is a legal defence against the complainant, his assignees. But they may avoid this defence in equity by showing that they were induced to take the assignment, and advance their money upon it, by the acts and conduct of the defendant, which make him guilty of a constructive fraud, or by such omissions or gross negligence as imply fraud. If the complainants had made application to the defendant to know what amount was due upon the bond and mortgage, and the defendant had told them the amount without apprizing them of the existence of the release, or if the defendant had stood by silently, and seen the complainants advance their money upon the assignment, he would not, in a court of equity, be permitted to set up the release against the party claiming under such assignment. A man who designedly or knowingly produces a false impression upon another, who is thereby drawn into some act or contract injurious to his own rights or interests, is guilty of constructive fraud, against which a court of equity will afford an adequate relief. This is a familiar principle of equity. It will be found supported by numerous authorities in 1 *Story's Eq. J.*, § 384, and following sections and notes to the same.

Let us see whether the complainants can avail themselves of this principle. It is said that the defendant treated the bond and mortgage as valid and subsisting

obligations binding upon him after the execution of the release. An acknowledgment of the amount of money due upon the bond, and that it was a subsisting debt, would not, either in a court of equity or law, prevent the defendant from pleading the release as against the obligee. Such an acknowledgment would not destroy the release. To make it available to these complainants, they must show that the act was prejudicial to them, and was made under circumstances to induce them, upon the faith of such acknowledgment, to part with their money. If the acknowledgment was not made for the purpose, or under circumstances calculated to mislead the complainants, it could not be construed as a fraud upon them.

The only acknowledgment proved to have been made by the defendant is by a witness, who says, that some time in 1848, he had a casual conversation with the defendant, and asked him how he was getting along with his business. "He said, very well; his business had done well, so far as he had gone with it; that his debts were mostly paid, with the exception of the mortgage that Stephen held upon his property in Rockaway." There certainly was nothing in this conversation which Stephen W. Righter could take advantage of in any way. It was about this time that he sent the bond and mortgage, by Mr. Chandler, to the defendant to collect the interest upon it, when the defendant produced the release, and claimed it as a discharge of the bond and mortgage. But how did anything said by the defendant, in the conversation alluded to, prejudice the complainants? They do not allege that what was then said was even *known* to them at the time of the assignment, and there is no proof that it was ever heard of by them until testified to by the witness. There can be no pretence that they advanced their money upon the strength of that conversation. If they did, that circumstance would not help them, for they ought not to have relied upon it.

There is only one other fact upon which the complain

ants rely to show a constructive fraud, and that is the pay-
ment of interest on the bond on the 20th of October, 1849.
Of what took place at the time of this payment, and of the
circumstances under which it was made, we have no legal
proof. The statements of the bill, as to the particulars of
the transaction, are denied by the answer, and neither the
statements of the bill or answer, as to the particulars, are
sustained by proof. The evidence of the attorney, detail-
ing the negotiation between himself and Stephen W.
Righter, and the declarations of the latter, are ruled out
as incompetent to be given in evidence. We have the
fact, that on the 20th of October, 1849, the defendant paid
to Stephen W. Righter seventy-three dollars and twenty-
nine cents for interest money due on the bond; that when
the payment was made the bond was not there, and a
loose receipt was given for the payment; that no money
was paid, but the defendant gave his due-bill for $12.86,
payable in time, and the balance, making up the amount
of $73.29, was settled by an account which the defendant
had against Stephen W. Righter. The mere fact of this
payment is no bar or estoppel to the defendant's pleading
the release at law, or setting it up in this court against
the obligor. The release the defendant might or might
not set up, as he pleased. It was a legal discharge to the
whole amount due; but because the defendant did not
choose to take advantage of it to its full extent, what rea-
son has the obligor to complain? The payment was for
his benefit, and did not or could not prejudice him in any
manner. A sealed instrument could not be defeated by
such an act. If it is said the payment is an admission of
the obligor that the release does not extend to the bond,
or that it was not the *intention* of the parties that it should
extend to it, the answer is, the release speaks for itself,
and as to its embracing the bond there is no question; the
instrument must be construed as to its legal effect, and
the intention of the parties cannot be substituted. Do the
complainants stand in any better situation than their as

signor? The complainants had the opportunity of making application directly to the defendant to know whether he had any defence, legal or equitable, against the bond. If such application had been made, and the defendant had told them the sum of $1500 was due, and had not disclosed their release, then the defendant would have been estopped from setting it up against them. This is quite as far as any of the cases referred to go. In *Davison* v. *Franklin* (1 *Barn.* & *Adol.* 142; 20 *E. C. L.* 253), a warrant of attorney was given to confess judgment for a gaming debt. The plaintiff, Davison, purchased the judgment; but before doing so, his attorney produced the bond to the defendant, and informed him it had been offered for sale, and asked him whether he admitted it to be a good debt, and whether it was given for a good and valuable consideration. The defendant replied, " Yes, this is my handwriting; I owe Mr. Davison the money, and have no objection to make to it; it will be paid when it is due." In *Watson's Executors* v. *McLaren* (19 *Wend.* 557), the extent of the principle established was, that declaring a note to be good, to one about to purchase it, or standing by in silence when it is transferred for consideration, is an estoppel *in pais* against a debtor. In *Foster* v. *Newland* (21 *Wend.* 94), the principle settled was, that where a *debtor* admits to a third person an existing balance due from him on a bond or other chose in action, and upon the strength of such admission such person takes an assignment of the bond or other chose in action, the debtor, in a suit subsequently brought for the recovery of such balance, is *estopped* from showing a claim against the original creditor for the purpose of reducing the amount of the recovery, although the assignment was taken for a *precedent debt*.

Now in this case no application was made by the complainants, or on their behalf to the defendant, to ascertain the validity of the bond, or what was due upon it. He was not apprized of their intention to purchase the bond.

He was guilty of no act of commission or omission having any reference to the complainants' purchase. The payment of the interest was a private dealing between the debtor and creditor without any reference to third persons, and affecting no one's interest but their own. The complainants may have been induced by it to run the risk of purchasing the bond, but they cannot say that they have been defrauded by the defendant's conduct. The bond in the hands of a third person was *prima facie* evidence that the amount it called for was due and owing, and that it was a valid bond. The payment of interest upon it was *prima facie* evidence that the balance was due. The complainants chose to take the bond upon the representations of the obligee, and not upon the faith of anything that was done by the obligor. The truth is the complainants did not take the bond relying upon anything that was said or done by the obligor. How did they know that the interest was paid on the 20th of October, 1849? They derived their information from the obligee alone. He brought to their attorney, written on a paper about two inches long and one inch wide, the following memorandum in the handwriting of the defendant: "$73.79, Rec'd Oct. 20, 1849." They took his word for it that this was for interest on the bond. In looking at the conduct of the defendant, there can be no doubt that if application had been made directly to him, he would have denied his liability upon the bond, and insisted upon the release. No one can look at the case—the pleadings, the evidence, and the circumstances, and not be satisfied that the procuring of the payment of the interest and of the memorandum referred to was a contrivance of Stephen W. Righter to obtain something from the defendant which would estop him from pleading the release against an assignee of the bond.

This case is an extremely hard one for Stephen W. Righter. It is evident that he has never received payment of the money intended to be secured by the bond and

2 x*

mortgage. But here is a solemn instrument, executed under his seal, by which he releases the obligee from the payment of that bond. This court has no right to set it aside unless for fraud, or to control its legal effect unless some mistake can be shown. I can make no new principle of law or equity to relieve the particular hardship of any case.

The appeal was argued by

*Whelpley* and *Dodd*, for appellants.

*Chandler* and *Zabriskie*, for respondents.

The opinion of the court was delivered by

POTTS, J. The object of the bill of complaint in this case was to have a certain release, executed by Stephen Righter to Michael Righter, on the 19th May, 1847, declared fraudulent and void, or to have it reformed so far as respects the bond and mortgage held by the complainants; and for an injunction, &c.

This bond and mortgage had been given by Michael to Stephen, in 1842, and Stephen assigned to the complainants, for full consideration, in 1849, there being then $1500 due on the bond.

The release in question was a general release, and Michael sets it up as a bar to a recovery upon the bond and mortgage.

The complainants, in the first place, allege *fraud* in the inception of this release. Parol evidence is admissible for the purpose of establishing this allegation; and by this means the facts and circumstances connected with the execution of this paper were brought before the court.

They were briefly these: Joseph C. Righter was the holder of certain drafts, drawn by Kitchel on parties at the South, and *endorsed by Michael Righter*. They had been protested, and were of doubtful value. He put these drafts

into the hands of Stephen Righter, to be collected for his, Joseph's, use; and Stephen brought a suit upon them, in his own name, against Kitchel, the drawer.

Michael Righter was deemed to be an important witness for Stephen in that suit; and about the time of the trial, it seems to have been supposed that, to make him competent as a witness, it was necessary that Stephen should release him. The attorney who had charge of the suit filled up a printed form of a general release for Stephen to execute; and after some objection, that it was too broad, which was obviated by the assurance of the attorney that he might safely sign it, he put his name to it.

It clearly appears that the *object* of executing this release was to make Michael Righter a *competent witness* in the case of *Righter* v. *Kitchel.* No other purpose was expressed, or even hinted at, by anybody, either before or at the time of the execution. Michael never suggested any other use to be made of it. For that single purpose it was prepared by the attorney. For that purpose, alone, Stephen executed it. Michael undoubtedly *knew when he received it* that that was the sole purpose for which Stephen executed and delivered it to him. He was present with Stephen at its execution, and this purpose was, beyond a question, clearly understood. Not only the pleadings and the evidence, but the circumstances of the case show this. In the first place, Stephen had no *personal interest* whatever in the suit against Kitchel. He was merely the nominal plaintiff. He held the drafts merely for collection. He had no earthly motive to execute such a paper beyond a desire to befriend the plaintiff in the suit. And, in the second place, the release was a *boon bestowed on Michael;* he was the party who received a favor, if anybody. It released him from his liability as endorser on the drafts. It was valuable to him in that aspect of the case. Under these circumstances, it is impossible to conceive why Stephen should have intended to make a great pecuniary sacrifice, to give up a bond and mortgage for a large amount

for the purpose of inducing Michael to accept this instrument, or why Michael should have expected to obtain a large pecuniary compensation for consenting to be released from heavy legal liabilities.

Michael Righter is probably the first person who ever gravely pretended in a court of justice that he had been paid $1500, or its equivalent, for *consenting to be released from his endorsements on commercial paper.*

A strange idea seems to have got into this case, that this release had something to do with an *interest* Michael claims that he had in these drafts. Stephen's release had nothing to do with that. To effect that interest, if he had any, the release should have been executed by Michael to Stephen. In point of fact, Stephen's release was unnecessary for the purpose of Michael's competency as a witness. It was his interest in the drafts, if he had any, that made him incompetent. And upon his own case, as he states it, he got a release from his liability as endorser on the drafts, got $1500 to boot by covering the bond and mortgage with the same release, and then went into court and testified as a disinterested witness in a suit brought to recover the amount of the drafts of which he was the owner of one moiety at the time, and which interest, as far as appears, he has never in any way surrendered or compromised.

The fact is established, there can be no doubt about it, that both Stephen and Michael, *at the time of the execution of this release,* understood perfectly that the object, and the sole object of it, was to make him, Michael, competent as a witness; that no other purpose was intended or dreamed of by Stephen; and Michael knew very well that if Stephen had had the most distant intimation that it was to be used to bar a recovery of the bond and mortgage, it would never have been given.

Michael says, in his answer, it was " a general release from said Stephen W. Righter to myself, of such force and effect as it purports to be, and I *made use of that opportunity to insist upon and obtain it.*"

Then he insisted upon it; he was instrumental in obtaining it. He insisted upon, he was instrumental in obtaining an instrument without any consideration in the world, which operated as a bar to the recovery of a bond of some $1500, an honest debt due from him to his neighbor, without that neighbor having the least idea that that was to be the purpose of it—he knowing that that neighbor was to be deceived and cheated by its operation.

What is fraud but the obtaining an advantage over another by deception, trick, or artifice? To say that he stood by, was silent, and said nothing; that it was the negligence of the attorney or the lack of caution in Stephen that induced the execution of such an instrument, is to stick in the bark of the transaction. *He who intended at the time to turn the transaction from an innocent to a fraudulent purpose is a fraud doer.* There was fraud in obtaining *such* a release for *such* a purpose.

Upon this ground, in my judgment, the decree below should be reversed.

I am of opinion there is another ground upon which the complainants below are entitled to relief upon the strength of the evidence in this case. Michael Righter was indirectly instrumental in inducing the complainants to take an assignment of the bond and mortgage. He went to Stephen before the assignment, on the 20th of October, 1849, and paid, or settled with him for $73.79 on account of interest due on this very bond, wrote a receipt with his own hand for Stephen to sign for the amount, expressing that it was for interest due on this very bond held by Stephen against him, and gave to Stephen a paper on which he wrote " $73.79, Rec'd Oct. 20, 1849," in order that he might endorse it on the bond; he said nothing of the release; and though he did not see or communicate with the complainants or their attorney himself, yet he, by this means, authorized Stephen *truthfully* to represent to the complainants' counsel that that amount of interest had been paid that day on the bond

by Michael himself, and that he had thus virtually acknowledged his indebtedness for the balance of principal and interest remaining due. If this transaction had taken place in the presence of the complainants of their attorney, it would have estopped Michael from setting up the release as against the assignees of the bond and mortgage; and the distinction between an act done in the *presence* of a party, by which he is induced to become a purchaser, and the same act done in the presence of a *third* party, and which, being *truthfully* represented to another, induces him, upon that information, to purchase, is a distinction without a difference. An "equitable estoppel," says Mr. Justice Carpenter, in *Den.* v. *Baldwin*, 1 *Zab.* 403, "rests upon the principle, that when any one has done an act or made a statement which it would be fraud on his part to controvert or impair, and such act or statement has so influenced any one that it has been acted upon, the party making it will be estopped and cut off from the power of retraction. It must appear, first, that he has done some act or made some admission inconsistent with his claim; secondly, that the other party has acted on such conduct or admission; and thirdly, that such party will be injured by allowing such conduct or admission to be withdrawn."

The decree of the court below is reversed.

The following dissenting opinion was read by

ELMER, J. I am compelled to dissent from the opinion of the majority of the court. That the release which is sought to be avoided is sufficient in law to discharge the judgment and the collateral bond and mortgage held, when it was executed, by Stephen W. Righter, the releasor, is not disputed. That Stephen must have understood that such would be its legal effect, appears to me unquestionable. It is expressly stated in the bill that he objected to it at the time as covering everything; but was answered, that it was no matter, as it would be given up to him as soon as the trial was over. There is, therefore,

not the slightest ground for the charge that there was a mistake in point of fact. If it was true, which by no means appears, that he was mistaken as to its legal operation, and was ignorant that it discharged his claim on the bond and mortgage, he is entitled to no relief on that ground, it being his duty to inform himself, as he had ample opportunity to do. If, as the bill states and the facts of the case tend to show, he relied on the expectation that it would be given up as soon as the trial was over, he is precluded by his own showing from objecting to the consequences of his own folly. It was not and could not be denied, that if the release was intentionally executed in so broad a form as to discharge the mortgage debt, so as to enable Michael Righter to become a witness, with the understanding that it should be afterwards surrendered, this was a fraud upon the law, and the court will not lend its aid to relieve the party from the consequences of his own wrong doing.

But the ground most relied on for setting aside the release is, that it was procured by the fraudulent contrivance or concealment of Michael Righter, the respondent. If this charge is established, there can be no doubt of the power and duty of a court of equity to interfere, and prevent it from discharging an honest debt. In order to ascertain in what the fraud is alleged to have consisted, we must look to the bill of complaint, for the appellants must stand or fall by the case they have themselves presented. Much of the argument of their counsel went upon grounds not only not presented, but upon such as are inconsistent with the case made.

The allegations of the bill are, not that Michael Righter was or claimed to be interested in the suit brought against Matthias Kitchel, in the name of Stephen W. Righter, as the endorser of the drafts, and not that the object of the release was to discharge that interest; but that he alleged the drafts were given for the payment of a debt, half of which was due to him, and that he was still entitled to

half of whatever should be collected on them; and that Stephen W. Righter was advised by his attorney, that it might become necessary upon the trial to call and examine Michael Righter, as a witness; and that, as his testimony might be objected to on the ground of his interest in the event of the suit, it was necessary and proper to execute a release to him. It is also averred that when the release was filled up, Stephen objected to it, as being too broad and general in its terms, as covering everything; whereupon Michael replied, that it was no matter, as the release should be given up to Stephen as soon as the trial was over. Also, that Michael Righter well knew he had no interest in the suit, and that the attorney advised Stephen it was right and safe for him to sign the release, and thereupon, and in consequence of such promise as aforesaid, (that is to give it up) he executed it, and it was delivered to Michael Righter, who was sworn and examined as a witness in the cause. The bill also avers that Stephen W. Righter never received any consideration for the release, not even the nominal sum of one dollar, mentioned therein, and that it was never his intention to release the judgment, and that Michael Righter never asked him to do so, or intimated to him, in any way, that he wished him to execute the said release for that purpose.

In response to these allegations, the answer of Michael Righter states, that he was entitled to one half of whatever should be recovered on the drafts, and states how his interest arose. It states that, having this interest, his intention was to appropriate the same towards the payment of his indebtedness to Stephen, and that he so informed him; that when he was informed the drafts were in the hands of Stephen, and it was intended to suc Kitchel on them, he expressed his disapprobation to Stephen, and the suit was brought without his approbation or consent; that the suits remained pending for about two years: and being asked by John S. Hager, the attorney for the plaintiff, what was his interest in the drafts, he in-

formed him; and that he would not be sworn on said trial as a witness until he had something to show for said drafts, and an equivalent for his interest therein; and the attorney told him it would be necessary he and Stephen should come down to his office before said trial, and make an arrangement of those matters; that within a few days Stephen came to him, and desired him to go to Morristown upon a day he fixed; that he did go there on that day, and at the office of the attorney met Stephen, and in his presence told the attorney the circumstances relating to the drafts, and expressed his dissatisfaction with the suit against Kitchel, and fear that the amount thereof would be lost in that way, and declared that he would not consent to be sworn upon said trial, or have anything to do with said suit, unless his said interest in said drafts was divested, and the same accounted for to and settled with him by the said Stephen, and that the one equal half part of said drafts was nearly equal to the amount then owed by him to said Stephen, and that the attorney told Stephen it would, according to the agreement and the circumstances there stated, be proper and necessary for him to execute a release, and thereupon the attorney filled up a printed release, and the same was executed by the said Stephen; that it was delivered and put into his pocket, and that in a few minutes afterwards, at the request of the attorney, he handed it back to him, to be returned in court, which was afterwards done. He denies that he ever promised to give it up as soon as the trial was over.

An attempt was made to disprove the answer, but it entirely failed. The weight of the evidence is, that Michael Righter was in justice entitled to one half of the drafts. It is not stated in the bill or answer, nor does it distinctly appear by the evidence, what was said by Michael Righter when he was sworn as a witness and produced the release in regard to his interest in the drafts. The only possible mode in which the release to him by

Stephen could operate to discharge his interest in the event of the suit, was by his receiving it as an equivalent for that interest. Having done this, and being actually sworn, he was precluded from setting up that interest afterwards, whether he was in fact questioned as to his interest or not. Unless the release is allowed to operate in discharge of Stephen's judgment against him, the result would be that he was entrapped into an act which cut him off from any right to what might be recovered of Kitchel, or of the other parties to the drafts, without any equivalent whatever. It is not necessary, however, to the validity of this release that a consideration should be shown. If it clearly appeared that there was none, that would no doubt be a strong reason for inferring a mistake or fraud. But all the circumstances combine to show that the very consideration the bill states was pretended and was false, in reality existed, and that Stephen W. Righter, with full knowledge of the facts, or at least with ample opportunity to ascertain the facts and the law, and acting under the advice of his counsel, thought it a sufficient reason for signing and delivering a general release of all his claims against Michael, that Michael should consent to be a witness for him, and, if needful, declare himself to have no interest in the suit. Such a consideration is perfectly valid if the parties acted in good faith, and there is no evidence that Michael did not. It does not appear that he instigated the suit, or that he volunteered to be a witness. The contrary is distinctly averred, and there is nothing to disprove the answer in these particulars.

That Michael Righter was afterwards willing to have a settlement of what his proper share of the money due on the drafts was, and pay Stephen the difference, the evidence shows, and he does not deny. But it is not pretended that this is a sufficient ground for interfering with the legal effect of the release. It is not alleged that there was any miscalculation or misapprehension as to the real amount due on the judgment. That it was highly impru

dent in Stephen to execute such a release, now that the suit against Kitchel has failed, is very obvious. But courts of equity cannot relieve parties from the unexpected consequences of their voluntary acts, unless it is made very satisfactorily to appear that they were the victims of a mistake they are not themselves accountable for, or of fraud on the part of those who claim against them. I am therefore of opinion that the release stands wholly unimpeached and in full force.

The appellants however insist, that being assignees for a valuable consideration without notice of the release, and having been induced to take the assignment by the acts and admissions of Michael Righter, he cannot in good faith set up the release, as against them, whatever may be its effect as between him and Stephen W. Righter. An estoppel *in pais* is stated by Judge Carpenter, in the case of *Den* v. *Baldwin,* 1 *Zab.* 403, to be as follows: "This equitable estoppel rests upon the principal, that when any one has done an act or made a statement which it would be fraud on his part to controvert or impair, and such act or statement has so influenced any one that it has been acted upon, the party making it will be estopped and cut off from the power of retraction. It must appear, first, that he has done some act or made some admission inconsistent with his claim; secondly, that the other party has acted upon such conduct or admission; and thirdly, that such party will be injured by allowing such conduct or admission to be withdrawn. It is intended that in good conscience and honest dealing he ought not to be permitted to gainsay them." This statement of the doctrine may be accepted as correct; but it does not profess to contain all the explanations of which it is susceptible. In most cases, it will be important to inquire how or to whom the acts or admissions were made. The object is to prevent fraud. Unless, therefore, the acts or admissions were so made as to show a design to produce a false impression, or were of such a kind that such would be their

natural result, there would be no fraud to prevent. No case was produced, nor do I suppose one can be found, that goes farther than this. Where it is said the admissions must be acted on, it is meant, as the authorities relied on show, that they induced the other party to do what otherwise he would not have done.

It is to be noticed, in the first place, that the appellants are themselves chargeable with great negligence in not applying themselves, or by their agent, to Michael Righter, and thus ascertaining whether he acknowledged the debt. Judgments and bonds and mortgages are always taken by an assignee, as they were bound to know, and as their counsel did know, subject to whatever defence the maker had as against the assignor. In this case they were about to accept the assignment of a judgment and collateral bond and mortgage payable on demand and more than seven years old. Had their agent applied to Michael, and he had stated to him that he held the release, and claimed that it discharged the debt, but nevertheless, inasmuch as the amount of his interest in the drafts was less than the amount due on the judgment, or for any other reason, he was willing to pay, and did pay the interest appearing to be due, to take a receipt for it as so much due, and allow such payment to be endorsed on the bond, it cannot be pretended the assignees would have stood in any better situation than Stephen did. Instead of applying directly to Michael, it appears the appellants thought proper to act upon the faith of the statements made by Stephen, and it is urged, that to the extent that Stephen's statements were true they had a right to do so. But did Stephen tell them the whole truth? If he did, he told them that he had previously placed the bond and mortgage in the hands of an attorney to collect the interest; that the attorney applied to Michael accordingly, and he produced the release as a complete discharge, and refused to pay, and thereupon the attorney handed them back to Stephen, and informed him of what had taken place. By making

Stephen their agent, they became chargeable with all the knowledge he had.

Had the appellants gone to Michael, and informed him that they proposed to take the assignment, he would have been bound to disclose his real position. But he was not bound to inform Stephen of what he already knew, and cannot be charged with doing an act inconsistent with his claim because he said nothing then about the release. Unless the admission made to Stephen would enable him to enforce the judgment, it could place his assignees in no better position. The receipt drawn up by Michael and signed by Stephen was retained by Michael, and all that Stephen had to show to the counsel of the appellants was the memorandum "$73.79, Rec'd Oct. 20, 1849," which of itself indicated nothing, and was not an act on which the assignees had any right to rely or upon which they did rely. They did not take the securities upon the faith of this paper, but upon the faith of Stephen's representations, which were only a part of the truth. There was, in my opinion, no act or admission made by Michael inconsistent with his claim to hold on to the release, and his willingness to settle with Stephen the difference between his interest in the drafts and the amount due on the judgment.

Equity, it was insisted, carries this species of estoppel further than courts of law, and we were referred to several cases contained in *Batten on Specif. Per.* 88.[*]  The author states the principle to be deduced from them as follows: "When a person has tacitly encouraged the act being done, or has consented to it, he shall not exercise his legal right in opposition to that consent." That Michael Righter did not consent to an assignment he never heard of is clear. Did he tacitly encourage it? This, in the nature of things and according to the cases, he could only do by keeping back something he was bound to communicate.

---

[*] 7 Law Lib., 69 Rep.

He did not do this, for Stephen W. Righter, with whom alone he had intercourse, knew all about the release. The only act, then, that he can be charged with doing is the putting on paper the figures indicating the amount to be credited, which would not of itself induce any man of ordinary prudence to rely on the securities, and which could not of itself have influenced the appellants to do so.

But besides these considerations, it appears that the appellants were careful to take a covenant from Stephen W. Righter, that he would guarantee the payment of the money, and pay all the costs of attempting to recover it in case of failure. It is not alleged in the bill, nor does it appear in the proofs, that Stephen is not perfectly able to fulfil these covenants. If he is, the appellants will not be injured by the release, and thus an essential fact necessary to estop Michael Righter, is wanting.

It must be borne in mind, in applying the doctrine of equitable estoppels to this case, that it must be assumed that the release is a valid instrument, and fully bars the claim on the judgment and other securities, as against Stephen W. Righter. The doubt about the original execution of the release, if doubt there be, can have no rightful influence upon the question, whether Michael Righter is precluded by his subsequent conduct from setting it up against the assignees. Had it appeared beyond dispute that it was given for a full consideration, and that the consequence of avoiding it would be to take the money a second time out of Michael's pocket, the estoppel would probably not have been insisted on, or if it had been would have found but little favor. And yet this is the aspect in which we are bound to look at this question. There can be no doubt that this doctrine, rightfully applied, is calculated to promote just and honest conduct, and that courts of equity and of law ought carefully to maintain it. But we are asked, in my judgment, to extend it beyond its just limits and beyond any precedent in England or America. I am not willing to do this for

the sake of saving a case of seeming hardship. In my opinion the decree should be affirmed.

Decision reversed by the following vote:

*For affirmance*—CHIEF JUSTICE, Judges ELMER, RISLEY, VREEDENBURG, OGDEN.

*For reversal*—Judges ARROWSMITH, CORNELISON, HAINES, HUYLER, POTTS, RYERSON, VALENTINE, WILLS.